# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00600-CR

---

**Deondre White, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 331ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-23-904005, THE HONORABLE BRAD URRUTIA, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Appellant Deondre White was convicted of murder and sentenced to thirty-years' imprisonment. Tex. Penal Code §§ 12.32, 19.02. In his sole issue, White alleges that the evidence was legally insufficient to support the jury's rejection of his self-defense and defense-of-others claims.[1] Based on the reasons stated below, we will modify the judgment to correct a clerical error and affirm the trial court's judgment as modified.

### BACKGROUND

*The incident*

Detective James Eichenholz testified that he was one of the detectives assigned to investigate a mass shooting on 6th Street, an entertainment district in Austin. He collected and

---

[1] Because the evidence for both of White's defense claims is the same and he addressed them together and interchangeably in his appellate brief, we will address them both collectively as his self-defense claim.

reviewed all the available video recordings of the incident to create a timeline of the events and edited the videos together into a compilation format that "told a story." He used multiple police officers' body camera footage, surveillance video from restaurants and bars in the area, HALO footage from overhead cameras that are monitored and operated remotely in real time, and footage recorded by a witness. Although the shooting was not captured on film, Detective Eichenholz worked with two other detectives, whose investigations helped identify the suspects. Detective Eichenholz used their information to highlight the movements of two groups believed to be involved in the shooting. "Group one" was made up of Majyran Jackson, Mahkalen Jackson (collectively "the Jackson brothers"), and Tyshaun Degrate. "Group two" was White, Carlos Latimer, Jeremiah Tabb, and "two black females." Detective Eichenholz also highlighted one of the victims of the shooting, Douglas Kantor, throughout the video. Kantor was walking along the street and was not part of either group one or two.

Detective Eichenholz testified, and the video corroborated, that prior to the shooting, group two arrived at 6th Street and group one quickly noticed them and started following. The two groups stopped on the sidewalk near each other but still separated. Group one was watching group two. Latimer noticed that group one was watching them. As group two started walking towards the Mooseknuckle Pub, group one followed them but kept walking a little past where group two stopped walking. Group one then turned around and came back toward group two. Group one "angled" towards group two, with Degrate going to the left and the Jackson brothers going to the right to go around different sides of parked motorcycles.

At this point, the two groups were out of view of any cameras. However, a YouTube content creator that was doing an interview down the street, captured the sounds of gunshots and the beginning of the crowd starting to disperse and run away from the gunfire.

2

Detective Eichenholz described the sound as "rapid, distinct, steady gunfire, [that] sounds like it's coming from one weapon." Surveillance video from multiple businesses captured the evacuation routes of both group one and group two as they fled 6th Street in different directions. The video then focused on the first aid that was rendered to the victims.

Multiple surviving victims of the shooting who were not associated with either group one or group two testified at trial. Jessica Ramirez testified that she was waiting in line to get into a bar on 6th Street when she was shot. She testified that she did not hear any raised voices or arguing before she heard the shots fired. Jesse Sepeda testified that he was shot in the arm while walking down the middle of the street and his friend was shot in the "lower buttocks" while admiring a parked motorcycle. Sepeda heard more than five gunshots, which he thought were spaced out. He also heard yelling right before the gun shots started, but he thought that the people fighting sounded like a man and a woman.

Dominique Herrera testified that he was waiting in line to enter a bar about 15 to 20 feet away from the shooter that night. He described the shooter as a black male wearing a black hoodie with his hair in either "dreadlocks," "twisties," or "twistlocks." He testified that he saw sparks coming from the gun. He did not see anyone else with a gun or hear any other gunshots. The shooter was on the sidewalk shooting towards the street "where the people were walking." When asked if the shooter was shooting at a specific person, Herrera responded, "No," and explained that the shooter was shooting "just the crowd." Although on cross, he agreed that he was focused on the shooter at the time and there may have been a person who was the target of the shooting. Herrera did not hear any yelling or fighting before the gunshots.

3

*The initial response*

Officer Tommy Lester testified that he was on patrol on 6th Street when multiple gunshots were fired at about 1:25 am on June 12, 2021. He explained that it had been a more crowded than usual night downtown because it was the weekend of the annual motorcycle event called "ROT Rally" and the motorcycles parked along the street caused the pedestrians to be more crowded together than usual. He described the crowds as "shoulder to shoulder, bumping into one another."

Earlier in the night, he had noticed two young-looking people wearing hoodies although it was a hot and humid evening. Officer Lester's description of these two people matched Detective Eichenholz's description of the Jackson brothers. Officer Lester testified that right before the shooting, he noticed the two people wearing hoodies again, but they were no longer joking and chatting with each other while walking and they had zipped up their hoodies and were pulling up their pants as if about to get into a fight. They started moving to the left and did what Officer Lester described as "triangulating," which is when one person splits off from the other and they approach a targeted person from different sides. Officer Lester testified that about 30 seconds after noticing the hoodie-wearing individuals again, he heard seven or eight shots that were fired from his left. He did not see the shooter or anyone with a gun. He never saw the two people in hoodies with a gun. He testified that based on his police and military experience, that he did not believe there was any return fire and that he "was pretty confident it was one weapon firing the rounds." At the time of the shooting, he thought the shooter was one of the hoodie-wearing individuals, but he did not see the shooting. After determining that the shooter was no longer firing into the crowd, Officer Lester began rendering first aid to one of the victims.

4

Senior Police Officer Joseph Spees testified that he provided a security role for the officers who were rendering aid to the victims. Once the victims were evacuated and the crime scene secured, he began focusing on evidence collection. He found eight shell casings on the sidewalk and the street. He preserved the location of the shell casings by placing traffic cones near them. There were no bullet holes in the buildings. Officer Spees created a diagram of what the scene looked like based on his skills from being a crash-scene investigator, his memory from the night of the shooting, and his body-cam footage. The diagram, which was admitted into evidence, showed eight victims: five in the street, two on the sidewalk hidden by motorcycles, and one that had been moved around the corner. According to the diagram, 8 shell casings were found clustered together just outside the Mooseknuckle Pub that is on the Northside of 6th Street. All the victims were Southeast of where the casings were found.

Officer Jamie Bryans testified that he was on the scene that night. He attempted life-saving measures on Kantor after he was shot. Kantor had a "through and through" gunshot wound to his chest and his left forearm. Officer Bryans testified that Kantor did not have any weapons on him. Because the shooter had not yet been identified and located, EMS was not able to come to where Officer Bryans and Kantor were. So, Officer Bryans transported Kantor in his police car to the nearest emergency room. Officer Bryans' body-cam footage was admitted and played for the jury.

*The investigation*

Based on admitted medical records, Kantor died in the hospital the next day. The preliminary cause of death was recorded as "chest gunshot wound." Dr. Vickie Willoughby, a

medical examiner, testified that Kantor's cause of death according to the autopsy was from "complications of the gunshot wounds."

Caitlan Longoria testified that she is a Crime Scene Specialist with the City of Austin Forensic Science Department. She arrived at the crime scene after it had been secured. Based on admitted crime-scene photos, she found eight shell casings in the same locations where Officer Spees had marked on his diagram, which was right in front of the Mooseknuckle Pub.

Detective Israel Billy Pina testified that he was the detective assigned to the case and in charge of delegating responsibilities to other detectives. He testified that the shooting resulted in fourteen victims of aggravated assault and one fatality. The investigation first focused on the members of group one. He testified that originally Degrate was arrested for deadly conduct after he interviewed the Jackson brothers. Those charges were later dropped after Degrate was interviewed and the forensic evidence corroborated that Degrate did not fire any shots. Specifically, there were no bullet holes in the brick, broken glass, or victims within the area that Degrate would have been shooting if he had fired his gun.

The next suspect arrested was Jeremiah Tabb, a member of group two. Detective Pina testified that a search of Tabb's phone as well as social-media records associated with Tabb, Latimer, and White, showed that the day after the shooting, Tabb had attempted to sell a gun through an online post. Detective Pina immediately recognized the gun as matching the murder weapon based on the evidence he had collected. Tabb was charged with tampering with physical evidence for his attempt to sell the gun.

While investigating Tabb, the investigation led to the identification of White as the suspected shooter. Detective Pina interviewed White on June 21, 2021. During that interview White stated that Tabb had recognized a guy who was a gang member, and that the

6

gang member was the person who shot at them and then his group ran away. When confronted with the fact that there were victims behind but not in front of the person White was claiming shot at them, White asked to leave. When asked what kind of gun he had with him, White denied having a gun with him, denied seeing Tabb with a gun, and then left the interview. Detective Pina testified that he believed he had probable cause to arrest White at that point, but that White was not arrested at that time because he had voluntarily come in for the interview.

White was arrested three days later. The suspected murder weapon that Tabb had attempted to sell was recovered when White was arrested. Ricardo Ramirez, a firearms forensic scientist, testified that it was the same gun used during the shooting on 6th Street. Detective Pina testified that White's cell phone was also collected at the time of his arrest and searched pursuant to a warrant. White's phone had been factory reset the day after his interview with Detective Pina. However, Detective Pina recovered data from White's online Cloud account, including text messages from a group chat between White and the women that had gone to 6th Street with him. The evening after the shooting, the members of the group chat encouraged White to change his appearance by suggesting he dye, bleach, or cut his hair and start wearing glasses. Detective Pina noted that when he interviewed White, his hair had been cut and looked different from the videos the night of the shooting. The group chat members also discussed that Tabb was attempting to get rid of the gun. White directed everyone on the chat to delete the messages.

Detective Pina testified that it was difficult interviewing the other individuals that were with Tabb and White the night of the shooting because they were "evasive," and their stories did not match the evidence from the crime scene. Detective Pina testified that Latimer was hard to track down because he had fled to Puerto Rico after the shooting but eventually returned and was interviewed.

7

Detective Jason Petty testified to the events that transpired when White was arrested. Detective Petty's team tracked White to a residence in Killeen. Within minutes of the team ordering all occupants to exit the residence, the other occupants—two adults and a small child—exited. However, it took over an hour and a SWAT team approaching the front door with a breaching ram, for White to exit the residence and surrender to police.

*Testimony from defendant and friends*

White testified in his own defense. White admitted that he had not told "the whole truth" when interviewed by detectives, but that he had decided to tell the truth at trial. He had graduated high school one year before the shooting and knew "the girls" in the group from school. He testified that he had a gun with him on 6th Street because he "always had a gun" on him. He testified that it was common for young people from his town to regularly carry firearms because it was a dangerous town for people his age. Latimer left his gun in the car when they arrived at 6th Street, but Tabb took his and questioned why Latimer would leave his gun by asking, "what if we run into the opps here." White testified that "opps" means enemies.

White testified that he was not expecting any trouble that night. He stated that both his and Tabb's guns were not visible. White testified that while on 6th Street, Tabb pointed out Degrate and identified him as a member of the Stretch Gang, which White explained was a gang he knew about and that was known for posting threats online about killing people. Degrate was wearing a ski mask and as he approached White's group, he started to pull it up to conceal his face. White could see that Degrate had a gun in his pants. Degrate had one hand on the gun and one hand holding up his pants as he approached. White was concerned because Degrate and the Jackson brothers were approaching from different sides. Degrate, the Jackson brothers, and

8

Tabb were "bickering back and forth." Degrate was "clutching" the gun. White testified that at this point he was not expecting a gunfight.

White's attention was drawn away from Degrate when one of the girls talked to him about trying to find other friends. White testified that when he looked back at Degrate, he was no longer "just holding the gun" but now was "in the middle of about to grab the gun and pull it out." White explained that Tabb had "antagoniz[ed] the situation" and that although the gun was not out of Degrate's pants yet or being pointed at anyone, White believed Degrate was about to use the gun because the gun was "coming out of his" underpants. White testified that is when he shot at Degrate. He explained that he was "shooting in his vicinity" and shooting at both "him and the people he was with." He testified that he thought one of the Jackson brothers may have had a gun because he was wearing a cross-body bag. On cross, White explained that he reached over Tabb's shoulder and shot "in the direction of" Degrate and that he did not shoot from the hip like two of the witnesses had testified.

White testified that Degrate and the Jackson brothers started to run, and so White stopped shooting when he thought they were no longer a threat. And then White and his group ran away. White did not realize at the time that anyone had been injured. When he was shooting, it did not occur to him that there were people behind Degrate and the Jackson brothers that could get shot if he missed. He testified that he was focused on Degrate. White testified that he believed at the time that if he did not shoot his gun then Degrate was going to shoot him or the people he was with. He testified that he changed his appearance, lied to the detectives, and delayed coming out of the house when he was arrested because he "was just scared" and was taking time "thinking about the situation." On cross, he admitted that he attempted to hide the gun when the arrest warrant was being served on him.

9

Tabb, Latimer, and Assiah Howard—who was standing with group two at the time of the shooting—all testified that White acted in their defense against Degrate pulling his gun and shooting them. Tabb testified that he did not see Degrate's gun, but believed Degrate had a gun and was pulling it out to shoot at them. Tabb admitted that he had a gun with him that night even though he knew it was illegal because he was only 17 years old. When asked on cross, why he did not pull his own gun when he thought Degrate was pulling his, Tabb replied that he "thought twice" about it. Tabb answered affirmatively when asked if it was because he was concerned about hurting other people.

*Testimony from members of "group one"*

Mahkalen Jackson testified that he was eighteen years old the night of the shooting. He was downtown from Killeen with his brother, Tyshaun Degrate, and four others to celebrate his sister's birthday. He knew Degrate had a gun on him. Of all the members of "group two," he only recognized Tabb from attending the same middle school. Mahkalen testified that right before the shooting, Degrate and Tabb were exchanging words in a manner that made Mahkalen think they were about to fight. Tabb had his hand on his side on a black gun and another man in the group had his arm over "his partner" and was holding a black gun in his hand. Then the "shots rang off." Degrate crouched behind a motorcycle. Both Jackson brothers were shot. Mahkalen was shot in the back of his leg, and his brother was shot in both hands. Mahkalen ran back to the car that he arrived in and met up with his group there.

Mahkalen explained that they dropped his brother off at a hospital, but that Mahkalen did not go until the next day even though his leg was bleeding. Mahkalen explained that he was afraid to go into the hospital because he was on probation and Degrate was only 15

10

years old and had a gun with him. Mahkalen was at a friend's house when the police came the next morning. He then received medical treatment for his gunshot wound. When Mahkalen was interviewed by police at the hospital, he told the police that Degrate had fired shots back and that Degrate told him he did it to protect them. Mahkalen explained at trial, that he told police that Degrate had fired his gun because he heard a group of seven shots, then four shots, and when they got back to the car Degrate was "playing with his gun" and Mahkalen noticed that the clip was empty, but he had seen at least three bullets in it earlier that night. Mahkalen testified that he did not witness Degrate shoot a gun that night.

When being interviewed by police in the hospital, Mahkalen identified Tabb, who he called "J.T.," as being at the scene. Mahkalen mistakenly identified the shooter as another person named J.T. who was not there that night. Mahkalen testified that after he saw a photo of White that the police posted on social media, he realized he had named the wrong person as the shooter, and that it had been White shooting that night. During his hospital interview, Mahkalen showed the police Instagram photos of the two people he referred to as "J.T.," including a photo of Tabb with his pants partially pulled down and secured with a belt and a gun poking out of the top. At trial, Mahkalen testified that Tabb was carrying his gun in the same manner the night on 6th Street.

Mahkalen denied ever hearing of the Stretch gang and denied being a part of a gang the night of the shooting. He testified that he was wearing a hoodie that night because he is anemic and feels cold even when it is not cold. He denied wearing the hoodie to conceal a gun or knife. He said his brother and his parents are the same way—wear jackets even when it is not cold.

11

Degrate testified that he was 15 years old at the time of the shooting. He went downtown to walk around and take pictures. Degrate admitted that he had a gun tucked in his underpants that night. He testified that it was the only time he carried a gun with him in that way. Although he had shot a gun in a field before. Degrate testified that before running into Tabb on 6th Street, he did not know that there was animosity between Tabb and either Jackson brother. He testified that he did not know Tabb would be there that night.

Degrate testified that he did not notice Tabb until Tabb yelled "What's up" to one of the Jackson brothers. As Degrate approached, Tabb said, "What's up, b*tch," to Mahkalen. Degrate then recognized Tabb from attending the same high school. Tabb asked Degrate if his group was "tryin' to fight?" Degrate testified that he put his hands up and answered that they were not. Tabb then started to "post up"—got in a fighting stance. Degrate testified that while he had his hands up, he realized that his gun was showing. He reached down to pull his pants up and his shirt down to cover his gun so that nearby police would not see it. Then the shooting started. He testified that the shooter was shooting from his hip and was "just shooting everywhere."

When Degrate heard the shots, he started running. He was not shot but there were two bullet holes in his jacket. Mahkalen was limping on the way back to the car because he was shot in the back of his leg. Degrate testified that he never pulled out his gun. He testified that Mahkalen's testimony that Degrate had said he fired his gun and that his gun was out of bullets at the car, were lies. He testified that he never said he fired his gun that night and that he still had bullets in his gun when he got to the car. Degrate was arrested that afternoon at a friend's house. The police collected the gun he had on him on 6th Street.

Degrate explained that he was wearing a ski mask that covered his head but showed his face. He testified that he was wearing it because he always wears one and it matched his outfit. He testified that when he went a different direction around the motorcycles towards group two that it was because he thought the Jackson brothers were still behind him.

At trial, Degrate admitted that he had a pending aggravated assault charge against him. He testified that Tabb "and them" are in the "543" clique, which he testified is not a gang. He testified that "the Stretch group" is also clique, and not a gang. He testified that at the time of the shooting he was not a part of either clique or of any gang.

*The verdict*

The defense requested and received jury instructions on self-defense and defense of a third party. After hearing all the evidence, the jury found White guilty of murder and assessed punishment at thirty years' imprisonment.

**STANDARD OF REVIEW**

"When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This standard requires the appellate court to defer 'to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "We may not re-weigh the evidence or substitute our judgment for that of the factfinder." *Id.* (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App.

13

2007)). Although factfinders "may not speculate about the meaning of facts or evidence," they are permitted to "draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial." *Id.* (citing *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). "We presume that the factfinder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution." *Id.* (citing *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012)). This is because the factfinders are "the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony." *Id.* (citing *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015)).

## DISCUSSION

A person commits murder if the person "intentionally or knowingly causes the death of an individual," or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b)(1), (2). A person is justified in using force against another when and to the degree he reasonably believes it is immediately necessary to protect himself against the other's use or attempted use of unlawful force. *Id.* § 9.31(a). As relevant here, a person is justified in using deadly force in self-defense when and to the degree he believes it immediately necessary to protect against another's use or attempted use of unlawful deadly force or to prevent the imminent commission

14

of murder. *Id.* § 9.32(a). A person is justified in using force or deadly force against another to protect a third person if under the circumstances as the actor reasonably believes them to be, the actor would be justified under Sections 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and the actor reasonably believes that his intervention is immediately necessary to protect the third person. *Id.* § 9.33. Verbal provocation alone is an insufficient justification for the use of force. *Id.* § 9.31(b)(1).

"[T]he issue of self-defense is an issue of fact to be determined by the jury." *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). When a defendant raises the issue of self-defense, "the State has the burden of persuasion in disproving the evidence of self-defense," but it is not required to "affirmatively produce evidence refuting the self-defense claim, but rather . . . to prove its case beyond a reasonable doubt." *Id.* In evaluating the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense, we ask not whether the evidence refuted the self-defense testimony but whether, viewing the evidence most favorably to the prosecution, a rational juror could have found against the claim of self-defense beyond a reasonable doubt. *Id.* at 914 ("A jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory."). Evidence supporting a claim of self-defense "will not render the State's evidence insufficient since the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence." *Id.*

In rejecting White's self-defense claim, "the jury found that the State proved beyond a reasonable doubt either (1) [he] did not reasonably believe that he was in danger of serious bodily injury, or (2) [he] did not reasonably believe that the degree of his force was immediately necessary to protect himself." *Rodriguez v. State*, 524 S.W.3d 389, 395 (Tex.

15

App.—Houston [14th Dist.] 2017, pet. ref'd). "The 'reasonably believes' language contains subjective and objective components," which requires that the defendant had the required subjective belief, and that the subjective belief was a reasonable one. *See Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). A "reasonable belief" is one "held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code § 1.07(a)(42).

White contends that the evidence was insufficient to reject his self-defense and defense of a third person claims because "no rational jury could have found that the state disproved self-defense beyond a reasonable doubt, even in the light most favorable to the verdict." Specifically, he contends that the state did not disprove the reasonableness of White's use of deadly force. In his appellate brief, White draws attention to the evidence presented at trial that supported his self-defense claim. Including his own testimony of his mental state at the time and testimony from his friends that his actions were in their defense to prevent them from being shot by Degrate. White notes that the only witnesses that had the same visual perspective as White, testified that Degrate was about to pull out his gun and shoot them.

However, the jury was entitled to resolve the conflicts in evidence against White and reject the self-defense evidence from White and his friend group based on credibility determinations. *See Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (concluding jury's rejection of self-defense claim sufficient based on implicit credibility determinations against defendant and his witness when only witnesses to the stabbing testified that defendant acted in self-defense). There was sufficient evidence to support the jury's rejection of his self-defense claim.

Here, White admitted to firing his gun that night. There was testimony and forensic evidence supporting that White was the only one shooting that night; that he fired eight

16

shots total into a very crowded area; and that he continued shooting after Degrate did not pull out the gun but instead retreated and hid behind a motorcycle before running away. *See Kelley v. State*, 968 S.W.2d 395, 401 (Tex. App.—Tyler 1998, no pet.) (explaining that evidence was sufficient for jury to reject self-defense claim when, in addition to other evidence, target of defendant's gunshots "fell to the ground," had broken his gun, and was "posing no threat" while defendant "continued shooting the victim"). Indeed, Mahkalen testified that he was shot in the back of the leg. Further, Herrera, one of the bystander witnesses not connected to either group, testified that he saw White firing the shots at the crowd rather than at a specific target. Additionally, Herrera and another bystander testified to hearing no argument or raised voices immediately prior to hearing the gunshots. The jury could have rejected White's self-defense claim based on the evidence that he was shooting at group one as they fled and that he was shooting into the crowd in general rather than at a target.

Degrate testified that before the shooting his hands were above his head in a gesture that he did not want to fight, and that when he moved his hands down, he was not pulling out a gun but was pulling his shirt down and his pants up to conceal the gun from law enforcement when White started shooting. *Harris v. State*, 668 S.W.3d 83, 90 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (explaining that even "[a]ssuming that [defendant] was aware that [victim] was armed and prepared to take the drugs by force, a rational jury could have found that" defendant did not have "a reasonable belief that deadly force was immediately necessary at the time of the shooting, as [victim] had not yet drawn his gun or otherwise threatened to use it at that time"). Mahkalen's testimony of events was contrary to group two's collective testimony that White pulled out his gun in response to Degrate pulling a gun. Mahkalen testified that White's gun was already out and resting on "his partner's" shoulder

while things were escalating between the two groups. White testified that he shot at Degrate over Tabb's shoulder. Mahkalen also testified that Tabb's gun was visible, and Tabb's hand was on it during the verbal exchange. Further, Tabb—who had the same perspective as White—testified that he did not see Degrate's gun and chose not to pull out his own gun. The jury could have believed the witness testimony supporting that Tabb and White had their hands on their guns and were visibly displaying them during a verbal argument and that Degrate never attempted to pull his out. The jury was free to reject White's self-defense evidence. *See Saxton*, 804 S.W.2d at 914.

In addition, there was also evidence presented of White's actions after the incident that are instructive. *See Hooper*, 214 S.W.3d at 13 (explaining that "[i]n reviewing the sufficiency of the evidence, [appellate courts] should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act,'" (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))). After the shooting, White took steps to avoid law enforcement. Evidence of flight and attempts to conceal one's identity to avoid arrest can reflect a "consciousness of guilt for the charged offense." *Yost v. State*, 222 S.W.3d 865, 875 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (en banc). Here, the surveillance video showed White's flight from 6th Street immediately following the shooting. *See Smith*, 355 S.W.3d at 146 (explaining that flight is one factor that can undermine defendant's self-defense claim). Further, Tabb attempted to sell White's gun online and White's friends encouraged him to change his appearance after the shooting. White cut his hair in between the shooting and his police interview, lied to detectives

regarding who the shooter was, and factory reset his phone the day after being interviewed. The jury could have believed that this behavior undermined his self-defense claim. *See id.*

Considering the evidence in the light most favorable to the verdict, we conclude that the jury could have believed that White did not subjectively believe he was in danger of serious bodily injury and that the degree of force was immediately necessary to protect himself, or that his belief was not objectively reasonable, *see Lozano*, 636 S.W.3d at 32, or that White's actions were in response to verbal provocation alone, *see* Tex. Penal Code § 9.31(b)(1). The evidence was sufficient to support the jury's rejection of White's self-defense claim.

Further, the evidence was sufficient to support White's conviction for murder. *See* Tex. Penal Code § 19.02; *Dearborn v. State*, 420 S.W.3d 366, 372 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Saxton*, 804 S.W.2d at 914) (explaining that when reviewing sufficiency issues regarding rejected self-defense theories, we must both "determine whether any rational trier of fact could have found beyond a reasonable doubt (1) the essential elements of the alleged offenses, and (2) against appellant on the self-defense issue"). White admitted, and multiple witnesses and forensic evidence supported, that he—and only he—fired his gun that night on 6th Street. Officer Bryans testified that Kantor was shot in that shooting. Dr. Willoughby testified that Kantor died from his gunshot wounds.

We overrule White's sufficiency of the evidence issue.

## MODIFICATION OF JUDGMENT

Our review of the record has revealed a clerical error in the judgment of conviction. Although it is clear from the record that White's trial was to a jury, the judgment incorrectly states that the conviction was by the trial court and that he waived his right to a trial by jury.

19

Thus, we modify the judgment by replacing the phrase "Judgment of Conviction by Court—Waiver of Jury Trial" with the phrase "Judgment of Conviction by Jury." *See Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) (en banc) (explaining that "[a]ppellate courts have the power to reform whatever the trial court could have corrected by a judgment nunc pro tunc where the evidence necessary to correct the judgment appears in the record"); *see also* Tex. R. App. P. 43.2(b).

## CONCLUSION

Because we have overruled White's sole issue, but have found a clerical error in the judgment, we affirm the trial court's judgment of conviction as modified.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Modified and, as Modified, Affirmed

Filed:   August 29, 2025

Do Not Publish

20